# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF MONTANA

In re:

PAMELA JEANNE STOKES,

    Debtor.

Case No. 9:21-bk-90126-WLH

**ORDER GRANTING IN PART TRUSTEE'S MOTION TO DISMISS**

    This matter is before the court on the chapter 13 trustee's opposed motion to dismiss this case with prejudice.[1] The court has fully considered all evidence and argument offered in support of and in opposition to the motion. For the reasons discussed below, the court grants the trustee's motion in part and limits the debtor's ability to obtain further bankruptcy relief.

## BACKGROUND

    The debtor, Pamela Jeanne Stokes, previously filed another voluntary chapter 13 petition in this district. In that case, the debtor completed a chapter 13 plan and obtained a discharge on January 18, 2018.[2]

    The debtor's spouse, John Patrick Stokes, is a frequent flier in the bankruptcy system and has filed five bankruptcy petitions in this district.[3] In the most recent case, Bankruptcy Judge Jim D. Pappas[4] granted the chapter 13

---

[1] ECF No. 30.

[2] *See* Case No. 14-61170 (Bankr. D. Mont.).

[3] *See* Case No. 21-90013 (Bankr. D. Mont.) (chapter 13 petition; dismissed with refiling bar); Case No. 18-60681 (Bankr. D. Mont.) (chapter 13 case dismissed based on finding that Mr. Stokes lacked a legitimate need for chapter 13 bankruptcy relief); Case No. 16-60720 (Bankr. D. Mont.) (chapter 13 case dismissed for failure to attend section 341 meeting); Case No. 15-60993 (Bankr. D. Mont.) (chapter 13 case voluntarily dismissed); Case No. 09-60265 (Bankr. D. Mont.) (chapter 7 case ending in discharge). Some of these bankruptcy cases resulted in numerous appeals to the Bankruptcy Appellate Panel and the Ninth Circuit Court of Appeals. Mr. Stokes also has an extensive litigation history in the Montana state court system. Indeed, the Montana Supreme Court determined that Mr. Stokes is a vexatious litigant and required him to obtain pre-filing approval before filing further pleadings in the state courts. *See Stokes v. First Am. Title Co. of Mont., Inc.*, 389 Mont. 245, 250 (2017).

[4] Bankruptcy Judge Pappas typically sits in the District of Idaho but was assigned Mr. Stokes' case as a visiting judge because Montana Bankruptcy Judge Benjamin P. Hursh recused himself due to a conflict. Because the

trustee's motion to dismiss similar to the motion at issue here. Judge Pappas wrote an extensive memorandum decision detailing the factual background and legal bases for the dismissal and imposition of a refiling bar.[5] This court incorporates and refers readers to Judge Pappas' decision for a complete discussion.

The apparent impetus for the Stokes' serial filings is their repeated efforts to delay surrendering possession of certain real property that the Stokes claim to own. Although successful in obtaining the desired delay thus far, these efforts lack a legal basis.[6] After the dismissal of Mr. Stokes' prior case, the Montana Supreme Court dismissed with prejudice the Stokes' appeal of a state-court judgment granting immediate possession of the property to the LSF8 Master Participation Trust and ordering that the Stokes be removed from the property.[7]

Rather than comply with the state-court judgment, the debtor filed the current bankruptcy case. Notably, Mr. Stokes largely appears to be prosecuting the case. He has filed papers, appeared at hearings, and sought to be heard on behalf

---

debtor filed documents alleging unarticulated litigation claims against Judges Hursh and Pappas, this case was assigned to the undersigned judge. *See* ECF No. 20.

[5] *See* Case No. 21-90013-JDP, ECF No. 65 (Bankr. D. Mont. Apr. 21, 2021). The memorandum decision is also available at 2021 Bankr. LEXIS 1100 and 2021 WL 1567500. Mr. Stokes filed several appeals from Judge Pappas' dismissal order and related rulings, but most of the appeals were dismissed when Mr. Stokes failed to pay the required filing fees. *See* Case No. 21-1105 (B.A.P. 9th Cir.); Case No. 21-1110 (B.A.P. 9th Cir.); Case No. 21-1111 (B.A.P. 9th Cir.); Case No. 21-1112 (B.A.P. 9th Cir.). One appeal remains pending and relates to Judge Pappas' denial of Mr. Stokes' recusal motion. *See* Case No. 21-1113 (B.A.P. 9th Cir.).

[6] For example, the Stokes contend that they purchased the subject property "free and clear" of any liens and security interests during Mr. Stokes' chapter 7 case in 2009. The Stokes have provided no documentation to support such a sale theory. Instead, the documents on file demonstrate that the chapter 7 trustee filed a complaint raising issues about the interests asserted in the property by various Stokes family members. *See* ECF No. 60-1 at pp. 1-7 of 30. The chapter 7 trustee and the Stokes settled that dispute and a related dispute about whether certain personal property was exempt; the bankruptcy court granted the trustee's Rule 9019 motion to approve the settlement. *See id.* at pp. 8-15 of 30. The settlement agreement did not effectuate any sale pursuant to Bankruptcy Code section 363(f), but instead reserved the ***trustee's option*** to pursue such a sale if the Stokes failed to perform their side of the settlement. *See id.* at p. 10 of 30 (under "Consensual Judgment" heading). The trustee did not compromise – and could not have compromised – any rights or property interests belonging to individual creditors. *See, e.g.*, *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 427-34 (1972). Nor did the trustee ever seek approval of any sale pursuant to Bankruptcy Code section 363(f), which would implicate procedural and substantive protections for any potentially affected secured creditors. *See* 11 U.S.C. § 363(f)(1)-(5); Fed. R. Bankr. P. 6004(a)-(c). Finally, contrary to Mr. Stokes' contentions, there is no "jurisdictional" obstacle preventing these issues from being considered as part of the long-pending state court litigation. *See* 28 U.S.C. § 1334(b) (creating expressly ***non-exclusive*** federal "jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11"); *see also, e.g.*, *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1803 (2019) (describing how disputes regarding bankruptcy discharge orders not only can but also should often be resolved in state courts). Setting all this aside, Mr. Stokes' understanding of the sale stated at the September 28, 2021 hearing is perhaps most revealing: Mr. Stokes believes that the property at issue is worth $3.4 million but he also asserts that the bankruptcy court in his prior chapter 7 case approved an asset sale to the Stokes for just $8,000 and that the reason for the 99.76% discount is a purported "life estate" on the property. *See* Audio File, ECF No. 62.

[7] *See* ECF Nos. 44-1, 44-2.

of the debtor based on a purported power of attorney and Montana Code section 72-31-347.[8]  Mr. Stokes is not an attorney.[9]  While the court permitted him to be heard, the court advised Mr. Stokes that he is not permitted to represent the debtor in the bankruptcy case.  Although the debtor did not appear at the initial hearing on the trustee's motion, the court continued the matter to allow the debtor to retain counsel.  At the continued hearing, both Mr. Stokes and the debtor appeared.  While Mr. Stokes primarily spoke on the debtor's behalf, the debtor commented extensively about her frustration regarding the long-pending litigation that the debtor now seeks to continue in bankruptcy court.  Both sought only to extensively and repeatedly rehash their threadbare litigation position about the real property.

## DISCUSSION

Access to bankruptcy relief in the United States is a privilege, not a right.[10]  Thus, for example, Congress has crafted several statutory provisions that limit a given debtor's ability to benefit from such fundamental bankruptcy protections as the automatic stay or the discharge, or even render certain debtors ineligible for bankruptcy relief whatsoever.[11]  Likewise, courts possess statutory and inherent powers to limit the relief available to debtors who act in bad faith, abuse the bankruptcy system, or fail to comply with basic requirements.[12]

---

[8] *See, e.g.*, ECF No. 46.  Although the scope of section 72-31-347 is broad, it never authorizes a non-lawyer to appear in court on behalf of an unrepresented person.  Indeed, the court doubts that the Montana legislature could grant such authority, particularly with respect to proceedings in federal courts that are governed by the clear and precedential rule that "a non-lawyer 'has no authority to appear as an attorney for others than himself.'" *Johns v. County of San Diego*, 114 F.3d 874, 877 (9th Cir. 1997) (quoting *C.E. Pope Equity Trust v. United States*, 818 F.2d 696, 697 (9th Cir. 1987)).

[9] *See* Audio File, ECF No. 53.

[10] *See, e.g.*, *United States v. Kras*, 409 U.S. 434, 446 (1973); *In re Juzwiak*, 89 F.3d 424, 427 (7th Cir. 1996).

[11] *See, e.g.*, 11 U.S.C. §§ 109, 362(b), 523(a), 727(a), 1141(d), 1328.  *See also generally Puerto Rico v. Franklin Cal. Tax-Free Trust*, 136 S. Ct. 1938, 1949 (2016) (explaining how Congress effectively barred certain Puerto Rican municipalities from any form of federal or local insolvency relief).

[12] *See, e.g.*, 11 U.S.C. §§ 105(a), 305(a), 349(a), 521(j), 707(a), 930(a), 1112(b), 1204(a), 1208(c), 1307(c); Fed. R. Bankr. P. 9011; *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 373-76 (2007); *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 765 (1980); *Knupfer v. Lindblade (In re Dyer)*, 322 F.3d 1178, 1196-97 (9th Cir. 2003); *Casse v. Key Bank Nat'l Ass'n (In re Casse)*, 198 F.3d 327, 336-41 (2d Cir. 1999).  More generally, the Supreme Court explained that every paper filed with a court, "no matter how repetitious or frivolous, requires some portion of the institution's limited resources" and that a court's "responsibility is to see that these resources are allocated in a way that promotes the interests of justice," a responsibility that includes stopping the "continual processing of . . . frivolous requests" and curbing "serious abuses" of the judicial system.  *See In re McDonald*, 489 U.S. 180, 184 (1989).  These considerations are particularly weighty in the bankruptcy context insofar as many bankruptcy courts accommodate significant numbers of *pro se* filings and should properly devote their limited resources to facilitating those honest debtors who are making legitimate efforts to obtain bankruptcy relief.

Neither the Supreme Court nor the Ninth Circuit have specifically addressed the question whether a bankruptcy court may bar a serial or abusive filer from refiling for a period of time.[13] Yet both tribunals have recognized that courts possess inherent authority "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases."[14] Like Article III courts, bankruptcy courts possess the inherent authority to sanction a party upon "an explicit finding of bad faith or willful misconduct."[15] This "authority allows a bankruptcy court to deter … a broad range of improper litigation tactics."[16] A bankruptcy court must of course exercise its inherent powers with "restraint and discretion," which requires "fashion[ing] an appropriate sanction for conduct which abuses the judicial process" and considering the availability of less drastic sanctions.[17]

A finding of bad faith constitutes "cause" to dismiss a chapter 13 petition with a permanent bar to discharge of debts existing on the petition date.[18] To determine that a debtor engaged in bad faith sufficient to justify such a dismissal, a court must consider the "totality of the circumstances," which includes applying the following *Leavitt* factors: (1) whether the debtor misrepresented facts in the petition, unfairly manipulated the Code, or filed a chapter 13 petition or plan in an inequitable manner; (2) the debtor's history of filings and dismissals; (3) whether the debtor intended only to defeat state court litigation; and (4) whether "egregious behavior is present."[19]

The bankruptcy court also possesses statutory authority to act to "enforce or implement court orders or rules, or to prevent an abuse of process."[20]

---

[13] Most courts that have addressed the question conclude that 11 U.S.C. §§ 105(a) and 349(a) provide authority to impose a refiling bar. *See, e.g.*, *In re Casse*, 198 F.3d at 337-39 (collecting cases). At least one circuit court has concluded that the ineligibility period contained in 11 U.S.C. § 109(g) represents the outer limits of a refiling bar, *see Frieouf v. United States (In re Frieouf)*, 938 F.2d 1099 (10th Cir. 1991), but this is a distinctly minority view and relies on a dubious interpretation of the Bankruptcy Code.

[14] *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991).

[15] *Price v. Lehtinen (In re Lehtinen)*, 564 F.3d 1052, 1058 (9th Cir. 2009) (abrogated on other grounds as recognized by *Gugliuzza v. Fed. Trade Comm'n (In re Gugliuzza)*, 852 F.3d 884, 898 (9th Cir. 2017)).

[16] *Id*.

[17] *See Chambers*, 501 U.S. at 44.

[18] *See Leavitt v. Soto (In re Leavitt)*, 171 F.3d 1219, 1223–24 (9th Cir. 1999) (setting forth requirements of dismissal "for cause" under 11 U.S.C. § 349(a)).

[19] *Id*. at 1224.

[20] 11 U.S.C. § 105(a). *See also generally Taggart*, 139 S. Ct. at 1801 (using section 105(a) to ground the bankruptcy courts' civil-contempt power and other enforcement mechanisms found in the judiciary's "old soil").

# FINDINGS & CONCLUSIONS

The court finds that all four *Leavitt* factors weigh against the debtor. As an initial matter, all the considerations detailed by Bankruptcy Judge Pappas in his thoughtful and detailed memorandum decision apply equally to Mrs. Stokes. The court accordingly adopts Judge Pappas' analysis and reasoning, specifically including his application of the *Leavitt* factors and his finding regarding ineligibility under Bankruptcy Code section 109(e), in their entirety. The court further finds that additional considerations support dismissal here.

First, the Stokes' sole and obvious intent through these serial filings is to stymie their secured creditors' nonbankruptcy remedies by systematically invoking the automatic stay through the filing of successive petitions. The Stokes are attempting to use the bankruptcy system to further their litigation position in what is nothing more than a two-party dispute, lacking any desire to reorganize, that has already consumed substantial judicial resources over many years. Compounding matters, Mrs. Stokes waited to file this case until after the Montana Supreme Court had dismissed the Stokes' appeal of adverse state-court rulings and now seeks to use the bankruptcy process as a vehicle to circumvent and relitigate those same rulings (i.e., get another proverbial "bite at the apple"). Consistently, the Stokes' behavior in prosecuting their cases further shows dilatory intent. The Stokes twice moved to continue the hearings on the trustee's motion to dismiss.[21] The second, filed just two hours before the hearing, asked that the hearing be postponed indefinitely. None of this is a proper use of the bankruptcy process.

Second, there is "egregious behavior present."[22] Mr. and Mrs. Stokes appear to be "tag-teaming" the system by filing separate individual petitions to further exploit the automatic stay and circumvent adverse court rulings. Indeed, footnote 6 of Judge Pappas' memorandum decision noted that it was odd that Mrs. Stokes was not a joint debtor in Mr. Stokes' prior case and that the reasons for her absence were "not apparent in the record." Regardless whether the Stokes deliberately preserved Mrs. Stokes' ability to file a subsequent bankruptcy petition, it is clear that the Stokes – largely acting through Mr. Stokes[23] – are now trying to use a

---

[21] *See* ECF Nos. 41, 61.

[22] *See In re Leavitt*, 171 F.3d at 1224.

[23] The Montana Supreme Court has observed that Mr. Stokes sometimes pursues his litigation efforts with or through his wife and cautioned that "courts should not permit John Stokes to engage in vexatious litigation tactics under her name." *See Stokes*, 389 Mont. at 250.

bankruptcy filing by Mrs. Stokes as a tactic to frustrate and collaterally attack Judge Pappas' decision and imposition of a refiling bar against Mr. Stokes. This tag-teaming behavior is an abuse of the bankruptcy process.

Third, several court filings on behalf of the debtor have made outlandish and inflammatory claims and accusations against various actors that are simply unwarranted.[24] Although the court understands that the Stokes have very strong feelings about their disputes with various parties and vigorously disagree with the prior rulings of various courts, such feelings are not a justification for blunderbuss imaginings of criminal conduct or juvenile name calling. To the contrary, it is egregious behavior for any party filing papers with a federal court to include this sort of baseless content in public filings.

Based on the totality of the circumstances, the court finds that there are multiple instances of bad faith and abuse attributable to the debtor. The court concludes that these findings justify dismissal under Bankruptcy Code section 105(a) "to prevent an abuse of process" and support a bar to refiling under section 105(a) and the court's inherent authority. The court also concludes that the bad faith findings constitute sufficient "cause" to impose the much more drastic remedy of permanently barring the debtor from discharging debts existing on the petition date.

---

[24] *See, e.g.*, ECF No. 1, Sch. A/B at p. 8 (asserting claims of $33,600,177 against "Judge Christopher, Judge Manley"); ECF No. 17 (debtor accusing the chapter 13 trustee and now Bankruptcy Judge Benjamin Hursh of "fraud against my estate and property in 2014, 2016, 2018" and seeking "[m]inimum damages of $4.6 million, plus treble damages, actual damages, plus punitive damages"); *id.* (same for an undefined claim against Bankruptcy Judge Pappas with "[d]amages to be determined"); ECF No. 18 at p. 1 (declaring that the chapter 13 trustee and Bankruptcy Judges Hursh and Pappas "are subject to suit and damages as listed, and are disqualified from this case"); ECF Nos. 27, 28 at p. 2 (alleging that the "United States department of Justice, Montana, in 2004 financed a $45,000 grant to the Montana Human Rights network to do a 'hit piece' against John Stokes"); ECF No. 35 at p. 5 (accusing Judge Manley of engaging in improper "*ex parte* contact with the defendants" in a state court action); *id.* at p. 6 (accusing various attorneys of "forging and fabricating false perjuried assignments"); ECF No. 51 at p. 1 (asserting that "[m]ortgage fraud is the number crime [sic] in America" and that "2 officers of this court are at the core of it"); ECF No. 56 at p. 1 (referencing "criminal and despicable individuals"); *id.* at p. 2 (debtor alleging that, after the initial hearing on the instant motion, "I got visited by Senior Protection Services of Montana. They 'just' received an 'anonymous' complaint that I was being abused and my husband cutting off my oxygen supply and medications . . . Then two days later, the same 'caller' made a claim that I joined my husband in a suicide pact. Whereas we were to get in our RV and both commit suicide." The debtor believes that both of these alleged calls were intended to remove her from the property at issue. She then queries: "Who would benefit from me being removed? Only one answer."); *id.* at p. 8 (charging the chapter 13 trustee of "working hand in glove with criminals" and having "involvement of the criminal activity"); ECF No. 60 at p. 3 (alleging that the "DOJ funded a $40,000 grant to Montana Human rights Network, in 2001 to go after my husband and destroy his business and 'run him' out of State."); *id.* at pp. 3-4 (debtor alleging that the Office of the United States Trustee "sent 30 armed SWAT deputies to seize my husbands [sic] business" and that "[t]hey also attempted to murder him that day"); ECF No. 61 at p. 2 (contending that the "DOJ and state courts have put a poison pill on us"). One filing even makes an unsubstantiated and false statement that this court engaged in *ex parte* contacts with a potential witness. *See* ECF No. 56 at p. 2. This colorful pattern of behavior and rhetoric appears to have occurred during the Stokes' several other bankruptcy cases.

The court has also determined, however, that a permanent bar may be unnecessarily harsh as such a remedy may not curb the abuse perpetrated by this debtor. Rather, the court concludes that the less drastic measure of a temporal bar to refiling is better tailored to prevent more improper bankruptcy filings. Thus, under its statutory authority to prevent abuse of process and its inherent sanctioning authority, the court now imposes a bar to refiling under any chapter of the Bankruptcy Code for a period of two years.

Based on the foregoing, it is **ORDERED** that:

1. The chapter 13 trustee's motion to dismiss [ECF No. 30] is GRANTED to the extent set forth below;

2. This bankruptcy case is dismissed;

3. The debtor is barred from refiling any further bankruptcy petitions until September 29, 2023;

4. The Clerk may refuse any petition submitted by the debtor until the expiration of the refiling bar;

5. The unpaid filing fee installment of $83.00 remains due and owing to the court by the debtor; and

6. All other pending motions are denied as moot.

This order is effective immediately upon entry on the docket.

DATED this 28th day of September, 2021.

_____
WHITMAN L. HOLT
U.S. BANKRUPTCY JUDGE